AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

UNDER SEAL

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Henry Watson, | ) | Case No. |
| | ) | |
| | ) | 3:19-71423 |
| Defendant(s) | ) | |

FILED
AUG 30 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
JCS

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __April 14, 2017__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_/s/_
WILLIAM FRENTZEN
Assistant United States Attorney

_Complainant's signature_

Janette Spring, Special Agent - FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __8/30/2019__

_Judge's signature_

City and state: __San Francisco, California__    Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for Dr. Henry WATSON ("WATSON").

2. There is probable cause to believe WATSON engaged in a scheme to commit Medicare fraud by receiving cash kickback payments in exchange for the referral of patients in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute. WATSON also introduced home health care marketers to other physicians willing to accept kickbacks in exchange for home health or hospice patient referrals.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE").

4. An identified co-conspirator informed the investigation that WATSON was a physician willing to accept kickbacks in exchange for patient referrals.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

1

5. During the course of the investigation, the UCE held multiple in-person audio and video recorded conversations with WATSON in 2017 in which WATSON received kickback payments, in the form of cash, in exchange for the referral of home health and/or hospice patients. WATSON also introduced the UCE to other physicians willing to engage in the scheme and received compensation from the UCE for those introductions. WATSON received over $10,000 in cash for referrals and introductions.

**B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION**

6. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment

2

7. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. The UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer the UCE to other violators who the targets believed to be engaged in similar conduct.

9. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For

---

amounts, discussed similar "longevity" bonuses. The UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

3

example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

4

choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or the UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

## C. AGENT QUALIFICATIONS

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

---

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

5

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

14. Dr. Henry WATSON, is a 63 year old physician operating the Watson Wellness Center in Oakland, CA. WATSON is also believed to reside in the Oakland, CA area. During the course of the investigation, WATSON accepted over $10,000 in kickbacks from an FBI UCE in exchange for patient referrals and the introduction of physicians other physicians willing to engage in the scheme.

### E. STATUTES VIOLATED

15. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

16. **Title 42, United States Code, Section 1320a-7b(b)(2)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in

kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II.   PROBABLE CAUSE

### A. WATSON IS INTRODUCED TO THE UCE BY A CO-CONSPIRATOR

17. In January 2017, CW-1 identified Glennda SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area.

18. CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area. In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs. SANTOS later introduced WATSON to CW-1 and the UCE in furtherance of the scheme.

19. During a consensually recorded meeting on March 23, 2017, CW-1 met with SANTOS and proposed a business partnership. CW-1 explained s/he and a business partner (the UCE) would be purchasing CW-1's home health company (an actual HHA hereinafter referred to as "HHA Alpha"). CW-1 further explained s/he and the business partner were looking to increase HHA Alpha's patient population prior to the purchase. As part of their agreement, SANTOS would introduce CW-1 and the business partner to individuals willing to accept kickbacks for patient referrals to HHA Alpha. During her conversation with CW-1, SANTOS indicated she knew who participated in similar kickback schemes and offered to pay these individuals on behalf of CW-1. SANTOS further indicated these individuals would benefit from a relationship with HHA Alpha as it would increase the number of companies to which they refer patients. In doing so, the individuals would avoid the appearance of having exclusive relationships with select HHA companies. SANTOS was aware these exclusive relationships drew scrutiny from Centers for Medicare and Medicaid Services ("CMS") and other oversight agencies. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| SANTOS: | So so what is the thing next? You will buy the company with a guy so you want me to help you on the end that I can bring patients... |
| ... | |
| SANTOS: | I know already who has access to who are paying. |
| CW-1: | Right. |
| SANTOS: | I just have to go into there, and then I will offer and then double it because one person cannot just work with one you know what I mean? |

20. On or about April 14, 2017, SANTOS sent a text message to CW-1 identifying three doctors, including "Dr Watson", as individuals willing to meet with CW-1 and the UCE. In accordance with their earlier discussions, CW-1 understood s/he was to contact and discuss the kickback scheme with these individuals. Set forth below is a screenshot of the aforementioned text message exchange:

Glenda

**Good morning**

**Dr Watson after 11 am
Dr Massen anytime of
the day**

21. During a recorded conversation between CW-1 and SANTOS on April 14, 2017, SANTOS confirmed she had already spoken to WATSON and she had "endorsed" CW-1 during their conversation. CW-1 understood SANTOS's endorsement as reassurance she had spoken to WATSON about engaging in a kickback arrangement with CW-1. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| CW-1: | Did you talk to Watson and Massen already? That we will be coming today or no? |
| SANTOS: | Yeah yeah you just have to tell me what time and when you are coming, then I can text them you are there, you're in the lobby. |
| ... | |
| SANTOS: | I endorsed you already. |

8

| | |
|---|---|
| CW-1: | Ok perfect. |

22. During the same conversation, SANTOS advised CW-1 on how to negotiate WATSON's kickback payment for patient referrals. SANTOS indicated WATSON already engaged in similar kickback schemes, clarifying she would only introduce CW-1 to "someone who does it already". Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| SANTOS: | This is what…with Watson, he will actually like ask you like what exactly like [the UCE] wants to uhhh, [the UCE] wants to give him. |
| CW-1: | Oh he will, he will, he will tell me? |
| SANTOS: | He will, ok let's say like you tell him like "Hey Dr. Watson, we are willing to give you three thousand this month, like how many patients can we get out of that?" |
| CW-1: | Ok. And he'll be ok? To talk to us? |
| SANTOS: | It is ok. |
| CW-1: | Ok perfect. |
| SANTOS: | I'm telling you, I'm giving you the ones that are hardcore. |
| CW-1: | Ok ok. |
| SANTOS: | Like someone who does it already. |

## B. WATSON ACCEPTS KICKBACKS PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS

23. On April 14, 2017, CW-1 and the UCE recorded a meeting with WATSON at his medical office in Oakland, CA. WATSON confirmed he had spoken to SANTOS prior to their meeting, stating "she was […] telling me that, you know, there's maybe a little bit new um gas in the tank." The UCE understood WATSON's use of the phrase "gas in the tank" to be a reference to anticipated kickback money.

24. During the same meeting, WATSON indicated he received kickbacks from other home health marketers. WATSON described a scenario when a home health marketer, or "rep",

9

gave him tickets to a professional basketball game as an inducement to sign patient referral forms. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| WATSON: | If you're you know busy, like myself, you know seeing a lot of really sick people and trying to fill out all the forms and do all the different stuff and then you you have a tendency to go with the easiest situation. |
| UCE: | Mmm hmm. |
| WATSON: | So like let's say if you have a rep here and they're they've got oh I brought you some forms and (UI) ah here's our card and blah blah blah and some tickets to the Warriors. |

25. WATSON and the UCE then discussed what type of patient referral could be expected in exchange for the kickback payment. While discussing patient referrals, the UCE offered to give WATSON "an envelope", which contained $3,000 cash. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | So um so I do have ah an envelope but ah do you have a feeling for let's say in a month's time a number of… |
| WATSON: | Yeah, are you looking to also do home health… |
| CW-1: | Yes. |
| UCE: | Yes. |
| WATSON: | …ok. |
| CW-1: | We can do some (UI) together. |
| WATSON: | Ok. |
| UCE: | Yeah Medicare Medicare either home health or or hospice either one works for us. |
| WATSON: | Ok… |

26. Shortly thereafter, the UCE handed WATSON the envelope containing $3,000 cash, which the UCE encouraged WATSON to open and count. WATSON declined, stating "Oh

10

no no I I I believe." The UCE understood WATSON's statement to be a show of trust regarding the amount of cash inside the envelope.

27. On June 29, 2017, the UCE recorded another meeting with WATSON, during which WATSON received a second payment of $3,000 cash for their "regular work" [patient referrals]. WATSON confirmed he was still interested in continuing with the scheme. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | ...I have something for our regular work. |
| WATSON: | Ok. |
| UCE: | Ah, if you're still interested in continuing? |
| WATSON: | Yes, yes. |
| UCE: | Ok, ah so roughly the same thing.  Roughly eight [patients] and ah if ah if it's good with you I think I can give you like 3,000 reasons to keep working with us (laughing). |
| WATSON: | Ok. Ok. |
| UCE: | Does that sound alright? |
| WATSON: | Ok. Absolutely yeah. |

28. During the course of the UCO, WATSON met with the UCE on at least five occasions, during which WATSON accepted cash in exchange for referring patients to HHA Alpha and/or introducing the UCE to other physicians willing to engage in the kickback scheme. In total, WATSON accepted over $10,000 in cash from the UCE and referred over eight patients to HHA Alpha, including at least three Medicare beneficiaries.

C. **WATSON INTRODUCES THE UCE TO CO-CONSPIRATORS**

29. During a recorded meeting at WATSON's medical office on May 2, 2017, WATSON and the UCE discussed WATSON's willingness to introduce the UCE to other physicians willing to engage in a similar kickback arrangement with the UCE. The UCE offered

11

to stop by and "show my appreciation" or pay WATSON $500 for each introduction to the physicians. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Based on what work you've done in the past with them that they'd uh if if any reason you get a feeling from them that they're of a different mindset… |
| WATSON: | Right. |
| UCE: | …currently I'd rather I'd rather pass and… |
| WATSON: | Right. |
| UCE: | I'd rather take only the ones that are sure and ah so if that sounds great. I know you're in a hurry. |
| … | |
| WATSON: | Great, if I think of some others off the top of my head, I'll let you know. |
| UCE: | Ok and ah just to let you know um are you ok with we always like to show our appreciation when people come on board are you comfortable with ah $500 referral fee? |
| WATSON: | Oh sure. |
| UCE: | Ok so. So once once we know that they're on board, I'll stop by and… |
| WATSON: | Ok. |
| UCE: | …I'll show my appreciation. |
| WATSON: | Ok. I I appreciate that. |

30. During a recorded meeting on June 29, 2017, WATSON gave the UCE a list of physicians' names who WATSON identified as physicians willing to engage in a similar kickback arrangement. WATSON instructed the UCE as how to approach the physicians, suggesting the UCE mention WATSON's name and use "code words". In suggesting the use of "code words", WATSON was aware of the illicit nature of his relationship with the UCE and

12

was attempting to conceal the illicit activity. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| WATSON: | You might use some kind of terms like ah Dr. Watson you know says he works you know worked very closely with you and we've he's sent us some patients ah he understand he was saying that you're very much entrepreneur and in the entrepreneurial spirit of business my time is a really good opportunity. Something like that. |
| UCE: | Sure. |
| WATSON: | You know, you know all the code words. |
| WATSON: | … |
| UCE: | . . . I don't generally say stuff like I've got reasons for you to meet me. |
| WATSON: | Yeah, that's . . . |
| UCE: | Thousands of reason to meet me. |
| WATSON: | Yeah, there there you go. |
| UCE: | (laughs) |
| WATSON: | There you go. That's real cuts right to the chase. |

31. On September 19, 2017, the UCE recorded a meeting with WATSON, during which they discussed the UCE's unsuccessful attempts to contact the physicians identified by WATSON. During their meeting, WATSON placed a phone call to one of the physicians, Dr. Scott TAYLOR ("TAYLOR"). The purpose of the call was to introduce TAYLOR to the UCE. When TAYLOR did not answer the call, WATSON left a voicemail message introducing the UCE as an individual who had "something that would put a smile on your [TAYLOR] face" and suggested TAYLOR take the opportunity to meet with the UCE.

32. Following WATSON's call to TAYLOR, WATSON placed another phone call to another physician, Dr. Kimberly HICKS ("HICKS"). HICKS answered WATSON's call and the

13

two spoke briefly. During their conversation WATSON explained to HICKS, "I got a gentleman, his name is [the UCE], and he, he does some work with [HHA Alpha], just in terms of helping them develop their business, and I think he, he might have something that you like, that he could holler at you about" and "You're gonna, you're gonna be happy with it."

33. Following WATSON's introduction, both HICKS and TAYLOR met with the UCE individually and accepted kickbacks in exchange for patient referrals.

34. During a recorded meeting with the UCE on October 19, 2107, HICKS accepted $3,000 in cash from the UCE and later referred one Medicare beneficiary to HHA Alpha

35. TAYLOR met with the UCE on two occasions, September 28, 2017 and December 8, 2017. During each meeting, TAYLOR accepted $2,000 in cash from the UCE in exchange for patient referrals. In total, TAYLOR referred five patients to HHA Alpha, including two Medicare beneficiaries

### D. WATSON IS PAID FOR INTRODUCING THE UCE TO CO-CONSPIRATORS

36. At the conclusion of their meeting on September 19, 2017, the UCE paid WATSON $3,000 in cash for "just for our regular business" [patient referrals] and then paid WATSON $500 in cash for contacting HICKS via telephone to introduce the UCE. The UCE offered to pay WATSON for additional introductions to those willing to engage in the scheme. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | So uh, so the three envelopes are a thousand each. That's… |
| WATSON: | Okay. |
| UCE: | …just for our regular business. |
| WATSON: | Okay. Thank you. |
| UCE: | And then uh, I, sounds very uh, good about both Dr. Hicks and uh, and uh, of course Doctor 1[6]. |

---

[6] Throughout this affidavit the names of physicians not charged during this investigation have been redacted.

| | |
|---|---|
| WATSON: | Yeah. Matthew. |
| UCE: | So that's that, and if uh, Mr. Taylor... |
| WATSON: | And then |
| UCE: | ...comes back I'll be happy to stop by again. |
| WATSON: | Okay. |
| UCE: | I very much appreciate it. |
| WATSON: | Okay. Thank you so much. That's very, very helpful. |

37. On or about September 29, 2017, following a successful meeting with TAYLOR, the UCE contacted WATSON via text message to arrange a meeting with WATSON in order to pay WATSON for his introduction to TAYLOR. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | I had a very pleasant meeting with dr. Taylor. Can I stop by now and thank you in person? If you're not available now I will come back some other day. |
| WATSON: | Today is fine. Come to the back and call me |

38. The UCE later recorded a meeting with WATSON on the same date at WATSON's medical office in Oakland, CA. During the recorded meeting, WATSON inquired about the meeting with TAYLOR. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Dr. How are you? |
| WATSON: | Good, good. So it worked out with Dr. Taylor? |
| UCE: | Excellent. Yes, he was very happy with the thing [kickback payment]... |

39. At the conclusion of their meeting, the UCE paid WATSON $500 in cash for the introduction of TAYLOR.

### E. WATSON ENGAGES IN A FALSE CLAIMS SCHEME WITH HOME HEALTH COMPANIES

40. A parallel FBI investigation into home health agencies in the San Francisco Bay Area revealed WATSON was likely engaged in a false claims scheme with the agencies. For the scheme, WATSON and home health marketers would recruit Medicare beneficiaries living in senior apartment complexes throughout the bay area. WATSON and the marketers would contact the beneficiary in their home, obtain the beneficiaries' personal information, including their Medicare number, and later bill Medicare for services that were not actually provided.

41. During the course of the investigation, FBI Agents interviewed approximately 30 patients from apartment complexes targeted by WATSON and home health marketers. From the interviews, Agents learned the beneficiaries were under the care of another physician, had no need for the home health services authorized by WATSON, and never received the services later billed to Medicare by WATSON and the home health companies.

42. An analysis of the Medicare data for these beneficiaries identified the following home health agencies were likely engaged in the scheme with WATSON: 1) Alert Home Health Care, Inc., 2) St. James Home Health, Inc., and 3) Premier Home Health Providers, Inc.

43. Between January 1, 2012 and October 31, 2018 WATSON authorized approximately $5,835,214 in services later billed to Medicare by these companies.

44. Between January 2013 and December 2018, WATSON was listed as the attending physician for approximately 255 Medicare beneficiaries, for whom Amity Home Health Care Inc. ("AMITY") submitted claims to Medicare, while simultaneously receiving $76,000 in payments, via check, from accounts held by AMITY and/or the owner of AMITY, RIDHIMA SINGH. Medicare reimbursed AMITY approximately $1,458,400 for those patient claims.

## III. PROBABLE CAUSE FOR THE VIOLATION

### A. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

45. Title 42 United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

46. Based on all of the foregoing, probable cause exists to believe that WATSON accepted kickback payments from the UCE that were intended to induce WATSON to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

47. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by WATSON for home health and/or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

48. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by WATSON in exchange for cash payments from the UCE meets the definition of a kickback payment and violates anti-kickback statute.

### B. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(2)(A), THE ANTI-KICK BACK STATUTE

49. Title 42 United States Code, Section 1320a-7b(b)(2)(A), in relevant part, makes it a crime to knowingly and willfully offer any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

50. WATSON's facilitation of the UCE's kickback payments to TAYLOR and HICKS in order to induce TAYLOR and HICKS to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

51. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by TAYLOR and HICKS for home health and/or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(2)(A).

52. Therefore, there is probable cause to believe that WATSON's facilitation of the UCE's kickback payments to TAYLOR and HICKS to induce TAYLOR and HICKS to send patient referrals to HHA Alpha, meets the definition of a kickback payment and violates anti-kickback statute.

## IV.  CONCLUSION

53. Based on the foregoing, there is probable cause to believe WATSON conspired to facilitate the payment of kickbacks in exchange for patient referrals and likewise accepted kickbacks in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) and (b)(2)(A).

//
//
//
//
//
//
//
//
//
//
//
//

## V.   REQUEST FOR SEALING

54. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 30th day of September, 2019.

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge

19